UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

**DENISE ELLIOTT-OWENS,** individually and
as Administratrix of the Estate of **NA'IM OWENS,**
deceased,

       Plaintiff,

 - against –

**THE CITY OF NEW YORK, POLICE OFFICER
ABBAS KYMIN** (Shield No. Unknown), **SGT. KWANE
KIPP** (Shield No. Unknown) **POLICE OFFICER
KONRAD ZAKIEWICZ** (Shield No Unknown) and
**POLICE OFFICER MARCEL FRANCIS** (Shield
No. Unknown) in their individual and official capacities
as Police Officers employed by the City of New York,

       Defendants.

-------------------------------------------------------------------------X

**THIRD
AMENDED
COMPLAINT**
CV 15-4751 (RJD)(SJB)
**PLAINTIFF DEMANDS
TRIAL BY JURY**

  Plaintiff, by her attorney, ANDREW F. PLASSE & ASSOCIATES LLC., as and for her Third Amended Complaint, hereby alleges and shows to the Court the following, all upon information and belief:

  1 Plaintiff Denise Elliott-Owens individually and as Administratrix of the Estate of Na'im Owens, deceased, hereby brings this action against the City of New York, Police Officer Abbas Kymin, Sgt. Kwane Kipp, Police Officer Konrad Zakiewicz, and Police Officer Marcel Francis individually in their individual and official capacities as Police Officers employed by the City of New York for damages arising out of unconstitutional policies and actions arising out of an alleged excessive use of force incident which occurred on August 31, 2014.

  2. Plaintiff brings this action against the defendants to redress the deprivation of rights secured to her and the decedent's Estate by the Fourth, Fifth, and Fourteenth

1

Amendments of the United States Constitution, the parallel rights of the New York State Constitution, and 42 U.S.C Section 1983.

3. At the time of the incident herein, plaintiff and plaintiff's decedent were residents of 590 Gates Ave., Brooklyn, NY. Each defendant is a citizen of the State of New York. The amount in controversy exceeds the sum of Seventy-Five Thousand [$75,000.00] Dollars, exclusive of interest and costs.

4. Heretofore, on or about the 6th day of September 2014, plaintiff's decedent, Na'im Owens, died at Kings County Hospital, Clarkson Avenue, Brooklyn, NY.

5. At all times hereinafter mentioned, the Plaintiff Denise Elliott-Owens was duly appointed Letters of Administration to be the Administratrix of the Estate of Na'im Owens, deceased, and said Letters remain in effect.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. Sections 1331, 1332, and 1343(a) (3) and 42 U.S.C. Section 1983.

7. Venue is proper in this District pursuant to 28 U.S.C. Section 1381.

8. At all times hereinafter mentioned the defendants Police Office Abbas Kymin, Sgt. Kwane Kipp, Police Officer Konrad Zakiewicz, and Police Officer Marcel Francis were employed as New York City Police Officers and acted under color of state law or a statute, ordinance, regulation or custom.

9. Upon information and belief, defendant City of New York was and now is, a municipal corporation, existing under and incorporated under the laws of the State of New York, with its principal place of business located at the Municipal Building, One Centre Street, New York, NY 10007.

10. That upon information and belief, the City of New York owned, operated, controlled and maintained the New York City Police Department by charter, or by law, under provisions of the State and/or City of New York

11. That heretofore, the Plaintiff caused a Notice of claim in writing, sworn to by and on behalf of the Plaintiff, to be duly served upon the defendant City of New York by delivering a copy thereof to the Office of the Corporation Counsel of the City of New York, which said Notice of claim set forth the name and post office address of the plaintiff, the nature of the claim, the time when, the place where and the manner in which said claim arose and the items of damages or injuries claimed to have been sustained so far as then practicable; and that this action is being commenced within one year after the happening of the event upon which this claim is based.

## STATEMENT OF FACTS

12. The Street Crime Unit (SCU), created in the 1970's was a commando like squad of police officers whose mission to was stop violent crime in the City and to remove illegal firearms in the streets.

13. Mayor Giuliani in 1994 upon assuming office, used the Street Crime Unit as his anti-crime strategy, deployed them in so called 'high crime' areas, like Brownsville, using race and national origin as the basis of suspicion of criminal activity for Stops.

14. The Street Crime Unit engaged in massive constitutional deprivations.

15. In 1997 SCU reported over 18,000 stop and frisks, but less than 5000 arrests.

16. In 1998, SCU reported a 50% increase in stop and frisk but less arrests than in 1997.

17. SCU revealed over these two yeas over 35,000 law abiding citizens were

stopped.

18. The stops turned to violence as Amadou Diallo was killed in February 1999 by 41 bullets as he stood in the vestibule of his apartment building.

19. In 1999, the Office of the Attorney General conducted an investigation of the NYPD's stop and frisk practices from January 1, 1998 to March 31, 1999 concluding that there was evidence of racial disparities and disparate impact on the basis of race.

20. The Attorney General found that from January 1998 to March 1999, Blacks comprised 25.6% of the City's population, and Hispanics 23.7%, but these two groups made up 83.6% of all stops by the NYPD. By contrast, Whites were 43.4% of the City's population but made up only 12.9% of all stops.

21. In 1999, in the class action lawsuit, Daniels, et al, v. The City of New York, et al, 99 CV 12696, in the SDNY, a challenge was made to the NYPD's unconstitutional policy, practice, and/or custom of conducting rampant stops and frisks of individuals without the reasonable articulable suspicion under the Fourth Amendments, and which impermissibly used race and/or national origin, as the determinative factor in making the stop in violation of the Fourteenth Amendment.

22. In 2003, a settlement resulted in a Stipulation requiring the NYPD to adopt a written policy prohibiting unlawful racial profiling.

23. Despite this Settlement, the NYPD continued to engage in racial profiling.

24. The following findings of fact were made in Floyd v. City of New York, 08 CV 1034 (SAS) on August 12, 2013 at Pages 6 &7:

25. Between January 2004 and January 2012, the NYPD conducted over 4.4 million Terry Stops.

26. The number of stops per year rose sharply from 314,000 in 2004 to a high of 686,000 in 2011.

27. 52% of all stops were followed by a protective frisk for weapons. A weapon was found after 1.5% of these frisks. In other words, in 98.5% of the 2.3 million frisks, no weapon was found.

28. 8% of all stops led to a search of the stopped person's clothing, ostensibly based on the officer feeling an object during the frisk that he suspected to be a weapon, or immediately perceived to be contraband other than a weapon. In 9% of these searches, the felt object was in fact a weapon. 91% of the time, it was not. In 14% of these searches, the felt object was in fact contraband. 86% of the time it was not.

29. 6% of all stops resulted in an arrest, and 6% resulted in a summons. The remaining 88% of the 4.4 million stops resulted in no further law enforcement action.

30. In 52% of the 4.4 million stops, the person stopped was black, in 31% the person was Hispanic, and 10% the person was white.

31. In 2010, New York City's resident population was 23% black, 29% Hispanic and 33% white.

32. In 23% of the stops of blacks and 24% of the stops of Hispanics, the officer recorded using force. The number for whites was 17%.

33. Weapons were seized in 1.0% of the stops of blacks, 1.1% of the stops of Hispanics, and 1.4% of the stops of whites.

34. Between 2004 and 2009, the percentage of stops where the officer failed to state a specific suspected crime rose on the UF 250 rose from 1% to 36%.

35. In the year 2014, the New York Civil Liberties Union conducted a survey and found that 55.4 percent of people stopped were black, down .4 percent from 2013 and up 0.6 per cent from 2012. In 2014, 30.2 per cent of those stopped were Latino, and 14.4 percent were white.

36. The New York Civil Liberties Union further found that neighborhoods with large minority populations, Brownsville, experienced, vastly more stops than mostly white neighborhoods in 2014.

37. In African American neighborhoods, such as Brownsville, NYPD officers in the year 2014 were engaged in rampant stops of individuals, including the plaintiff's decedent without reasonable suspicion.

38. The Fourteenth Amendment prohibits police officers from targeting individuals for stops on the basis of race or national origin.

39. Despite this, NYPD officers in violation of the Equal Protection Clause of the Fourteenth Amendment, often have used, and continue to use, race and/or national origin, not reasonable suspicion, as the determinative factor in deciding to stop and frisk individuals.

40. The NYPD widespread constitutional abuses of Terry Stops have flourished and come about directly and proximately caused by the polices, practices, and/or customs devised, implemented, and enforced by the City of New York; that the City of New York has acted with deliberate indifference to the constitutional rights of those who would come into contact with NYPD officers by (a) failing to properly screen, train and supervise NYPD officers; (b) failing to monitor NYPD officers and the stop and frisk polices; (c) failing to sufficiently discipline NYPD officers who engaged in constitutional

6

abuses; and (d) encouraging, sanctioning and failing to rectify the NYPD's unconstitutional practices.

41. The NYPD's intended Terry stop, in this case, in the Brownsville section of Brooklyn, borderline on the actions of an armed occupation against the civilian population of Brooklyn, in effect, targeting individuals in the plaintiff's decedent's neighborhood, not on the basis of reasonable suspicion, but on race.

42. The disparate treatment by the NYPD of civilians in Brownsville and Bedford Stuyvesant as opposed to Bayside and Whitestone, is a clear violation of Equal Protection Clause of the United States Constitution.

43. As a direct and proximate result of the defendant's policies of disparate Terry Stops, and its polices, practices and/or customs, the plaintiff's decedent was subjected to an unconstitutional Terry Stop by the defendants herein.

44. But for the unconstitutional Terry stop herein, there would have never been the tragic shooting death of the plaintiff's decedent herein as set forth below. (Sine qua non)

45. On August 31, 2014, at approximately 2:20 a.m., the plaintiff's decedent, an African American male, was walking alone westbound on Monroe Ave., toward the intersection of Marcus Garvey Blvd., Brooklyn, NY heading toward his home.

46. Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis were on a tour of duty in an unmarked Police car heading south on Marcus Garvey Blvd.

47. The unmarked Police car came to the intersection of Monroe Ave and Marcus Garvey Blvd., Brooklyn, NY.

48. Na'im Owens made a right-hand turn heading north on Marcus Garvey Blvd.

49. Without any articulable suspicion, other than that Na'im Owens, an African American was walking on the street, Officer Zakiewicz put his motor vehicle in reverse and then came to a short stop on Marcus Garvey Blvd, between Gates and Monroe.

50. Sgt. Kipp exited the car to make a stop of the plaintiff's decedent.

51. Police Officer Marcell Francis and Police Officer Zakiewicz exited the car and followed Sgt. Kipp to stop the plaintiff's decedent.

52. At or around the same time, Police Officer John Hirschberger and Police Officer Abbas Kymin were around the corner on southwest corner of Gates Ave and Marcus Garvey Blvd and approached the plaintiff's decedent to stop him.

53. Police Officer Zakiewicz, Police Officer Francis, and Sgt. Kipp, engaged in an illegal stop of the plaintiff without any reasonable suspicion.

54. Police Officer Zakiewicz, Police Officer Francis, Sgt. Kipp, and Police Officer Kymin drew their weapons to stop the plaintiff.

55. Police Officer Zakiewicz, Police Officer Francis, Sgt. Kipp, and Police Officer Kymin discharged their weapons at the plaintiff.

56. Na'im Owens ran in an Easterly Direction on Gates Ave, just a block away from his home in the other direction.

57. Na'im Owens was unarmed when he was shot once in the lower back by one of the Defendants.

58. Plaintiff's decedent was treated at Kings County hospital for his gunshot wound.

59. Plaintiff's decedent was arrested and charged with several felonies.

60. From August 31, 2014 to September 6, 2014, plaintiff's decedent sustained pain and suffering, undergoing several painful surgeries.

61. Plaintiff's decedent passed away on September 6, 2014 from his wounds, despite being able to communicate with his family, and despite the doctors' assurances that he would make a full recovery.

63. Members of the Plaintiff's decedent's family were present when Police Officers intentionally interfered with his physical recovery from his wounds.

## PLAINTIFF'S CLAIM

64. Upon information and belief, Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis, acted with actual malice toward the plaintiff and with willful and wanton indifference and deliberate disregard for the statutory and constitutional rights of the plaintiff.

65. Upon information and belief, the actions taken as aforesaid by Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis constituted excessive use of force, a violation of his Fourth Amendment rights, constituted an illegal stop based on racial animus, in violation of the Equal Protection Clause of the Fourteenth Amendment, and deprivation of liberty without due process of law.

66. Upon information and belief, the conduct of defendants Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis violated the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

**AS AND FOR A FIRST CAUSE OF ACTION PURSUANT TO 42 USC 1983, AGAINST DEFENDANTS POLICE OFFICER KYMIN, SGT. KIPP, POLICE OFFICER ZAKIEWICZ, and POLICE OFFICER FRANCIS, JOINTLY AND SEVERALLY, PLAINTIFF RESTATES AND REALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRPAHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:**

67. Upon information and belief, the actions taken as aforesaid by Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis constituted excessive force, in violation of the Fourth Amendment, and a deprivation of liberty without due process of law under the Fifth and Fourteenth Amendments and impermissibly used race and/or national origin, as the determinative factor in making the stop in violation of the Fourteenth Amendment in violation of the Equal Protection Clause.

68. Upon information and belief, the actions taken by Sgt. Kipp, Police Officer Zakiewicz, and Police Officer Francis, in stopping the plaintiff, based upon his race and/or national origin, as the determinative factor in being on Monroe Ave and Marcus Garvey Blvd., to make Terry Stops of African American Males, was in violation of the Equal Protection Clause of the Fourteenth Amendment.

69. The actions taken in performing a Stop based not on a reasonable suspicion, but solely on the basis of his national origin, is a violation of his Fourteenth Amendment rights under the Equal Protection Clause.

70. Upon information and belief, the actions taken by Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis in using excessive force on an unarmed African Male was in violation of the Fourth, Fifth and Fourteenth Amendments.

71. Upon information and belief, Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis acted with actual malice toward the Plaintiff and with willful and wanton indifference and deliberate disregard for the statutory and constitutional rights of the plaintiff.

72. Solely by reason of the above, the plaintiff sustained severe personal injuries, was rendered sick, sore, lame and disabled, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and plaintiff will be permanently caused to suffer pain, inconvenience and other effects of such injuries; plaintiff incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and plaintiff has been and continues to be unable to pursue the usual duties with the same degree of efficiency as prior to this accident, all to plaintiff's great damage.

73. That by virtue of the foregoing, Plaintiffs have been damaged in the amount of TEN MILLION [$10,000,000.00] DOLLARS.

**AS AND FOR A FIRST CAUSE OF ACTION FOR A MONELL CLAIM AGAINST DEFENDANT CITY OF NEW YORK, PLAINTIFF RESTATES AND REALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRAPHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:**

74. Upon information and belief, the actions taken as aforesaid by Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis, by conducting a Terry Stop on the basis of racial animus, constituted a violation of the Fourteenth Amendment, by discriminating against the plaintiff on account of his national origin.

75. The actions taken in performing a Stop based not on a reasonable suspicion, but solely on the basis of his national origin, is a violation of his Fourteenth Amendment rights under the Equal Protection Clause.

76. Upon information and belief, at all times pertinent hereto, New York City encouraged, permitted and tolerated a pattern and practice of discrimination on the basis of race, to perform Terry Stops, by Police Officers of the City of New York.

77. That on at least two prior occasions, (U. S. v. Price, U.S. v. Mayo), Police Officer Zakiewicz has been found to testify falsely regarding reasonable suspicion for a Terry Stop, yet despite media attention, newspaper articles, the City of New York continued to permit him to remain employed without any further training or disciplinary action, resulting in his exact same conduct in this case, i.e., stopping the plaintiff without reasonable suspicion based on racial animus, and falsifying his testimony herein to fit his own narrative, as he tried to do in the other cases.

78. Upon information and belief, the City of New York has a policy, express or implied, as set forth above, to permit and encourage its Police Officers to perform stops in a racially discriminatory manner, to devise false versions of events, and that this policy has been indoctrinated into the New York Police Department so that Officers in the course of their duty are more likely to stop people on the basis of race, instead of reasonable suspicion and more likely to perform these stops in predominantly black neighborhoods, than in white neighborhoods, resulting in the unconstitutional conduct and an impermissible stop of the plaintiff's decedent in this case, with the result that he was shot and killed.

79. Upon information and belief, the City of New York has furthered and implemented this policy, by maintaining a system of review of Police Officer conduct which is so untimely and cursory as to be ineffective, and which permits and tolerates the Terry Stops on a racially discriminatory manner, in violation of the Fourteenth Amendment.

80. At all times pertinent hereto, Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis were acting within the scope of their employment

and pursuant to the aforementioned policies and practices of the City of New York. These policies and practices which were enforced by Defendant City of New York were the moving force, proximate cause, and/or the affirmative link behind the conduct causing the plaintiff's injuries.

81. The City of New York is therefore liable for the violations of Plaintiff's constitutional rights by Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis.

82. That by virtue of the foregoing, Plaintiff has been damaged in the amount of TEN MILLION [$10,000,000.00] DOLLARS.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE CITY OF NEW YORK FOR WRONGFUL DEATH, PLAINTIFF RESTATES AND REALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRPAHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:**

83. That the death of Na'im Owens, as aforesaid, and the Claim of Denise Elliott Owens, as Administratrix of the Estate of Na'im Owens, was sustained through the tortious conduct of defendant City of New York's employees acting within the scope of their employment.

84. That by reason of the foregoing, the plaintiff and other next of kin of plaintiff's decedent, have suffered pecuniary loss, and been deprived of Na'im Owens' comfort, services, companionship, guidance, love, advice, love and affection, all to their damage in a substantial amount of money.

85. That by reason of the foregoing, the next of kin of the Plaintiff's decedent, has sustained severe and significant pecuniary loss in a substantial amount of money to be determined by this court.

86. That this action falls within one or more exceptions set forth in CPLR 1602.

13

87. That by reason of the foregoing, the plaintiff's decedent has been damaged in an amount which exceeds the jurisdictional limits of all lower state courts which would otherwise have jurisdiction

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE CITY OF NEW YORK FOR ASSAULT AND BATTERY, PLAINTIFF RESTATES AND REALLEGES EACH AND EVERY ALLEGATION SET FORTH IN PARAGRPAHS MARKED AND ENUMERATED "1-66" AND FURTHER ALLEGES AS FOLLOWS:**

88. That the employee of the defendant as aforesaid, in the scope of their employment as New York City Police Officers, assaulted and battered the plaintiff's decedent causing him to sustain severe personal injuries.

89. That such conduct was committed in the scope of employment with the City of New York.

90. The City of New York is liable for the intentional torts committed by its employees in the scope of their employment pursuant to the doctrine of respondeat superior.

91. That by reason of the foregoing, the plaintiff has been damaged in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**WHEREFORE,** Plaintiff demands Judgment as follows:

I. Judgment on the First Cause of Action against defendants Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis in the amount of TWENTY MILLION ($20,000,000.00) DOLLARS;

II. Judgment for Punitive Damages against defendants Police Officer Kymin, Sgt. Kipp, Police Officer Zakiewicz and Police Officer Francis in the amount of TWENTY MILLION ($10,000.00) DOLLARS;

III. Judgment on the First Cause of Action against the City of New York in the amount of TEN MILLION ($10,000,000.00) DOLLARS;

IV. Judgment on the Second Cause of Action against the City of New York in an amount which exceeds the jurisdictional limits of all lower State courts which would otherwise have jurisdiction;

V. Judgment on the Third Cause of Action against the City of New York in an amount which exceeds the jurisdictional limits of all lower State courts which would otherwise have jurisdiction;

VII. Together with the costs and disbursements of this action, for reasonable attorney's fees under the applicable Federal Statutes, and for such other and further relief as to this Court seems just and proper.

DATED:   August 4, 2018
         Flushing, New York

_____
ANDREW F. PLASSE, Esq.
BY: ANDREW F. PLASSE
Bar Roll No.: AP-3679
Attorney for the Plaintiff
Office and P.O. Address
163-07 Depot Road, Suite 205
Flushing, NY 11358
[212] 695-5811

**DEMAND FOR JURY TRIAL IS HEREBY MADE
PURSUANT TO RULE 38 OF THE FEDERAL
RULES OF CIVIL PROCEDURE**

_____
ANDREW F. PLASSE, Esq.
BY: ANDREW F. PLASSE
Bar Roll No.: AP-3679
Attorney for the Plaintiff
Office and P.O. Address
163-07 Depot Road, Suite 205
Flushing, NY 11358
[212] 695-5811